IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| ROMAN SENYZSYN | : | CIVIL ACTION |
|---|---|---|
| | : | |
| v. | : | |
| | : | |
| ANDREW SAUL, Commissioner of | : | NO.  18-4046 |
| Social Security[1] | : | |

## MEMORANDUM AND ORDER

ELIZABETH T. HEY, U.S.M.J.                                         July 18, 2019

Roman Senyzsyn ("Plaintiff") seeks review, pursuant to 42 U.S.C. § 405(g), of the

Commissioner's decision denying his claim for supplemental security income ("SSI").

For the reasons that follow, I conclude that the decision of the Administrative Law Judge

("ALJ") denying benefits is not supported by substantial evidence and will remand the

case for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

## I.    PROCEDURAL HISTORY

Plaintiff was born on October 17, 1966.  Tr. at 34, 193, 218.  He completed high

school, served in the United States Army,[2] and has past relevant work experience as a

UPS parcel sorter.  Id. at 58, 212, 223, 336.  On December 23, 2013, Plaintiff protectively

filed for SSI, alleging disability due to mental impairments beginning on October 10,

---

[1]Andrew Saul became the Commissioner of Social Security on June 17, 2019
("Commissioner").  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Mr.
Saul should be substituted for the former Acting Commissioner, Nancy Berryhill, as the
defendant in this action.  No further action need be taken to continue this suit pursuant to
section 205(g) of the Social Security Act.  42 U.S.C. § 405(g).

[2]Plaintiff served in the Army between 1984 and 1986, and he had an honorable
discharge.  Tr. at 446, 450.

2006.  Tr. at 193, 218, 222.   The application was denied, id. at 108-11, and Plaintiff

requested an administrative hearing before an ALJ.  Id. at 112-14.  At a hearing on July

15, 2016, Plaintiff requested a continuance to allow him time to obtain a psychological

evaluation and counsel.  Id. at 67-69.  On January 22, 2017, the ALJ conducted a second

hearing, id. at 26-64, at which time Plaintiff amended his alleged onset date to September

13, 2011, the day after the denial of his prior applications for disability insurance benefits

("DIB") and SSI.  Id. at 35.[3]  Id. at 26-72.  On July 19, 2017, the ALJ found that Plaintiff

was not disabled.  Id. at 13-21.  The Appeals Council denied Plaintiff's request for review

on September 5, 2018.  Id. at 1-3.

Plaintiff commenced this action in federal court on September 19, 2018.  Doc. 1.

The matter is now fully briefed and ripe for disposition.  Docs. 17-19.[4]

## II.    LEGAL STANDARD

The court's role on judicial review is to determine whether the Commissioner's

decision is supported by substantial evidence.  42 U.S.C. § 405(g); Schaudeck v. Comm'r

of Soc. Sec., 181 F.3d 429, 431 (3d Cir. 1999).  Therefore, the issue in this case is

whether there is substantial evidence to support the Commissioner's conclusions that

Plaintiff is not disabled and is capable of performing jobs that exist in significant

---

[3]Plaintiff did not appeal the prior decision dated September 12, 2011, which is included in the administrative record, and does not seek to reopen that decision.  Tr. at 76-89.  Because Plaintiff now seeks only SSI benefits, the effective alleged onset date is the application date, December 23, 2013.  See 20 C.F.R. § 416.335.

[4]The parties have consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c).  See Standing Order, In RE:  Direct Assignment of Social Security Appeal Cases to Magistrate Judges (Pilot Program) (E.D. Pa. Sept. 4, 2018); Doc. 4.

numbers in the national economy. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and must be "more than a mere scintilla." Zirnsak v. Colvin, 777 F.2d 607, 610 (3d Cir. 2014) (quoting Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)). The court has plenary review of legal issues. Schaudeck, 181 F.3d at 431.

To prove disability, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for . . . not less than twelve months." 42 U.S.C. § 423(d)(1). The Commissioner employs a five-step process, evaluating:

> 1.      Whether the claimant is currently engaged in substantially gainful activity;
>
> 2.      If not, whether the claimant has a "severe impairment" that significantly limits his physical or mental ability to perform basic work activities;
>
> 3.      If so, whether based on the medical evidence, the impairment meets or equals the criteria of an impairment listed in the "listing of impairments," 20 C.F.R. pt. 404, subpt. P, app. 1, which results in a presumption of disability;
>
> 4.      If the impairment does not meet or equal the criteria for a listed impairment, whether, despite the severe impairment, the claimant has the residual functional capacity ("RFC") to perform his past work; and
>
> 5.      If the claimant cannot perform his past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform.

See Zirnsak, 777 F.3d at 610; see also 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4).

Plaintiff bears the burden of proof at steps one through four, while the burden shifts to the

Commissioner at the fifth step to establish that the claimant is capable of performing

other jobs in the local and national economies, in light of his age, education, work

experience, and RFC. See Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 92 (3d Cir.

2007).

## III.  DISCUSSION

### A.  ALJ's Findings and Plaintiff's Claims

At step one of his July 19, 2017 decision, the ALJ found that Plaintiff has not

engaged in substantial gainful activity since December 23, 2013, the application date. Tr.

at 15. At step two, the ALJ found that Plaintiff has severe mental impairments consisting

of anxiety disorders, affective disorders, and substance addiction disorders. Id.[5] At step

three, the ALJ found that Plaintiff did not have an impairment or combination of

impairments that meets or medically equals the severity of one of the listed impairments

in 20 C.F.R. Part 404, Subpart P, Appendix 1. Id. The ALJ found that Plaintiff retains

the RFC to perform a full range of work at all exertional levels, but that he is limited to

simple work-related decisions, can only occasionally respond appropriately to supervisors

and co-workers, and can never respond appropriately to the public. Id. at 17. At steps

four and five the ALJ found that Plaintiff is unable to perform his past relevant work, id.

---

[5]According to his Disability Report, Plaintiff alleged disability due to Bipolar Disorder, Bipolar Affective Disorder, major depression, agoraphobia, panic attics, and anxiety. Tr. at 222. These disorders will be defined where appropriate.

at 19, but that considering Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. Id. at 20. Specifically, the ALJ found that Plaintiff could perform the jobs of industrial cleaner, landscape laborer, and laundry worker. Id. Thus, the ALJ found that Plaintiff was not disabled. Id. at 21.

Plaintiff argues that the ALJ's decision is not supported by substantial evidence because the ALJ (1) failed to consider the hearing testimony of Plaintiff's case manager and (2) improperly evaluated Plaintiff's subjective complaints, particularly regarding his inability to leave the house on a regular basis. Docs. 17 & 19.[6] Defendant responds that the ALJ's decision is supported by substantial evidence. Doc. 18.

### B. Summary of Medical Evidence

Plaintiff underwent an intake at South Jersey Behavioral Health Resources, Inc., on December 22, 2010. Tr. at 302-03.[7] Plaintiff reported anxiety and panic attacks every four days and that he did not like leaving his house. Id. at 303. He described his

---

[6]Plaintiff initially presented three claims, see Doc. 17 at 3, but his second and third claims both relate to the ALJ's evaluation of Plaintiff's subjective complaints. Those claims were jointly addressed by the Commissioner, see Doc. 18 at 8 n.3, and Plaintiff combined them in his reply brief. See Doc. 19 at 6-8. Likewise, I have combined them for purposes of discussion.

[7]It does not appear that the records of Plaintiff's treatment at this location are complete. He was accepted for treatment in December 2009, but there are no records other than the December 2010 intake and a questionnaire where he listed his medications on August 16, 2010. Tr. at 301-04. Plaintiff later reported a history depression since 1998, anxiety and panic attacks for which he saw doctors in 2001, and severe insomnia since 2005. Id. at 443.

symptoms as racing thoughts, loss of energy, sadness most days, feelings of

worthlessness, guilt, insomnia and hypersomnia, fluctuating appetite, diminished interest

in activities, diminished ability to think, irritability, impulsivity, and being easily

distracted.  Id.  Plaintiff was diagnosed with Bipolar Disorder, Most Recent Episode,

Unspe[cified], and Panic Disorder with Agoraphobia.  Id. at 302.[8]  He reported taking

Seroquel for sleep problems, Paxil for anxiety, and Depakote for panic attacks.  Id. at

304.[9]

---

[8]The specific type of bipolar disorder is not identified.  "The essential feature of
Bipolar I Disorder is a clinical course that is characterized by the occurrence of one or
more Manic Episodes or Mixed Episodes," and "[o]ften individuals have also had one or
more Major Depressive Episodes."  Diagnostic and Statistical Manual of Mental
Disorders, 4th ed. Text Revision (2000) ("DSM IV-TR"), at 382.  (Although the DSM
IV-TR has been superseded by the DSM-5, I will utilize the edition in effect at the
relevant time.)  "The essential feature of Bipolar II Disorder is a clinical course that is
characterized by the occurrence of one or more Major Depressive Episodes . . .
accompanied by at least one Hypomanic Episode . . . ."  Id. at 392.  "The essential feature
of Panic Disorder is the presence of recurrent, unexpected Panic Attacks . . . followed by
at leas 1 month of persistent concern about having another Panic Attack, worry about the
possible implications or consequences of the Panic Attacks, or a significant behavioral
change related to the attacks . . . ."  Id. at 433.  Agoraphobia is defined as "anxiety about
being in places or situations from which escape might be difficult (or embarrassing) or in
which help may not be available in the event of having a Panic Attack or panic-like
symptoms . . . ."  Id. at 432.

[9]Seroquel (generic quetiapine) is an antipsychotic medication used to treat
schizophrenia and bipolar disorder.  It is also used with antidepressant medication to treat
major depressive disorder.  See http://www.drugs.com/seroquel.html (last visited July 9,
2019).  Paxil (generic paroxetine) is an antidepressant used to treat various psychiatric
disorders, including depression, anxiety disorders, and post-traumatic stress disorder
("PTSD").  See https://www.drugs.com/paxil.html (last visited July 9, 2019).  Depakote
(generic divalproex sodium) is used to treat manic episodes related to bipolar disorder
(manic depression).  See http://www.drugs.com/depakote.html (last visited July 9, 2019).

Plaintiff began treatment at Northwestern Human Services ("NHS") in 2010, after moving with his mother from New Jersey. Tr. at 443.[10] On July 24, 2013, NHS physician Harold Graff, M.D., completed a Comprehensive Psychiatric Evaluation/Re-Evaluation of Plaintiff. Id. at 306-11. Dr. Graff noted that Plaintiff had been diagnosed with bipolar disorder[11] and had a twenty-year history of depression, a history of emotional abuse from his step-father, and a period of incarceration during which he was prescribed Trileptal, Sinequan, and Thorazine by the prison psychiatrist. Id. at 306.[12] Plaintiff previously abused alcohol but had been sober for eight years, and had never

---

[10]It appears that Plaintiff continued treatment at NHS through the time of his administrative hearing, but there are very few documents in the medical record. At the time of the administrative hearing, Plaintiff testified that he saw the doctor at NHS every six weeks, but had stopped seeing the therapist. Id. at 42.

[11]As with the earlier diagnosis of bipolar disorder, Dr. Graff did not identify a particular type of bipolar disorder. Under the newer version of the DSM in effect at the time of Dr. Graff's evaluation, the features of bipolar I disorder are a manic episode accompanied by specific additional symptoms which may have been preceded by and may be followed by hypomanic or depressive episodes. Diagnostic and Statistical Manual of Mental Disorders, 5th ed. (2013) ("DSM-5") at 123, 127. Bipolar II disorder is characterized by a clinical course of recurring mood episodes consisting of one or more major depressive episodes and at least one hypomanic episode, with requisite duration and a requisite number of symptoms present. Id. at 135.

[12]Trileptal (generic oxcarbazepine) is an anticonvulsant used to treat partial seizures by decreasing nerve impulses that cause seizes and pain. See https://www.drugs.com/trileptal.html (last visited July 8, 2019). Sinequan (generic doxepin) is used to treat symptoms of depression and/or anxiety associated with alcoholism, psychiatric conditions, or manic-depressive conditions. See http://www.drugs.com/mtm/doxepin-sinequan.html (last visited July 9, 2019). Thorazine (generic chlorpromazine) is used to treat psychotic disorders such as schizophrenia or manic-depression in adults. See http://www.drugs.com/mtm/chlorpromazine.html (last visited July 9, 2019).

been psychiatrically hospitalized.  Id.  The doctor summarized Plaintiff's complaints as depression, poor appetite, poor concentration, racing thoughts, mood swings, and avoidance of "social things."  Id.  His current medications were Seroquel, Trileptal, and Paxil.  Id.  Upon evaluation, Plaintiff was alert, cooperative, and fully oriented, with depressed mood, appropriate and calm affect, and appropriate thought content, thought process, and perceptions.  Id. at 309.  Plaintiff exhibited fair judgment and insight, no evidence of impairment in concentration or attention, and average estimated intelligence.  Id.  Dr. Graff listed Plaintiff's problems as unemployment, poor self-esteem, depression, and history of abuse.  Id. at 310.  The doctor diagnosed Plaintiff with Bipolar Disorder, NOS (not otherwise specified), Post-Traumatic Stress Disorder ("PTSD"), Chronic, and a Personality Disorder, NOS, [13] and assessed him with a current Global Assessment of Functioning ("GAF") score of 55 with 55 as his highest GAF in the past year.  Id. at 311.[14]

---

[13]The essential feature of PTSD is the development of characteristic symptoms following exposure to one or more traumatic events, as well as persistent avoidance of stimuli associated with the traumatic event(s).  DSM-5 at 274-75.  Personality Disorder, NOS, also known as unspecified personality disorder, includes instances where "the individual's personality pattern meets the general criteria for a personality disorder, but the individual is considered to have a personality disorder that is not included in the [ten listed types in the] DSM-5 classification."  Id. at 645-46.  "A personality disorder is an enduring pattern of inner experience and behavior that deviates markedly from the expectations of the individual's culture, [and] is pervasive and inflexible."  Id. at 645.

[14]A GAF score is a measurement of a person's overall psychological, social, and occupational functioning, and is used to assess mental health.  DSM IV-TR at 34.  A GAF score of 51 to 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) [or] moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-

On March 21, 2014, Richard G. Ivins, Ph.D., performed a consultative psychological evaluation of Plaintiff.  Tr. at 336-37.  Dr. Ivins noted Plaintiff's history of depression "all through the 1990's," and that it worsened after he separated from his common-law wife in 1997.  Id. at 336.  The doctor also noted Plaintiff's history of prior alcohol abuse, noting that except for two admissions for alcohol abuse, he has never been in any psychiatric hospital or unit.  Id.  He continued to take Seroquel, Sinequan, and Trileptal.  Id.  On mental status examination, Plaintiff noted his diagnosis of bipolar disorder and described himself as depressed.  Id.  He exhibited a flat affect, fair stream of thought, and minimal responses, with speech that was rambling, repetitious, and went off-topic.  Id.  Plaintiff denied suicidal or homicidal ideation and exhibited no clear delusional thinking.  Id.  His verbal abstract reasoning was poor, his verbal concept formation skills were in the normal range, his fund of general information was very good, and his arithmetic reasoning was good.  Id. at 337.  Plaintiff was oriented to person, place, and time, except for the correct date, with good remote memory, fair recent past memory, and good recent memory.  Id.  Plaintiff reported that his attention and concentration are poor and that his impulse control is generally good.  Id.  Dr. Ivins opined that Plaintiff had limited social judgment, noting that "he isolates himself from most people except his mother," and that he had fair insight into his present difficulties

workers)."  Id.  Although the fifth edition of the DSM eliminated reference to the GAF score, the Commissioner continues to receive and consider GAF scores in medical evidence, see Administrative Message-13066 (July 22, 2013), and an ALJ must consider a GAF score with all of the relevant evidence in the case file.  Nixon v. Colvin, 190 F. Supp.3d 444, 447 (E.D. Pa. 2016)).

and his need to continue with his mental health care.  Id.  The doctor diagnosed Plaintiff

with Bipolar Disorder, Depressed, and PTSD, and opined that his prognosis was

guarded.  Id.

Dr. Ivins also completed a Medical Source Statement of Ability to do Work-

Related Activities (Mental).  Tr. at 338-40.  Dr. Ivins opined that Plaintiff had mild

limitation in the ability to understand, remember, and carry out simple instructions, and

moderate limitation in the ability to understand, remember and carry out complex

instructions, and make judgments on simple or complex work-related decisions.  Id. at

338.[15]  The doctor further opined that Plaintiff had moderate limitation in his ability to

interact appropriately with the public, supervisors, and co-workers, and respond

appropriately to usual work situations and to changes in a routine work setting.  Id. at

339.  Dr. Ivins noted Plaintiff's history of alcohol dependence and his prior admissions

for alcohol treatment, and that he has not used alcohol since 2010.  Id.[16]

On March 31, 2014, Edward Jonas, Ph.D., completed a Psychiatric Review

Technique (PRT) as part of Plaintiff's initial disability determination.  Tr. at 99-100.  Dr.

Jonas opined that Plaintiff had a medically determinable affective disorder, anxiety-

related disorder, and substance addiction disorder, with mild restriction of activities of

daily living, moderate difficulty in maintaining social functioning and in maintaining

---

[15]"Mild" is defined on the form as "slight limitation in this area, but the individual
can generally function well," and "[m]oderate" is defined as "more than a slight
limitation . . . but the individual is still able to function satisfactorily."  Tr. at 338.

[16]In a later psychiatric evaluation dated November 29, 2016, Plaintiff reported that
he had been sober for one year.  Tr. at 450.

concentration, persistence or pace, and no repeated episodes of decompensation. Dr.

Jonas also completed a mental RFC assessment. Id. at 101-03. In the category of

understanding and memory limitations, Dr. Jonas opined that Plaintiff was not

significantly limited in his ability to remember locations and work-like procedures or

understand and remember very short and simple instructions, and was moderately limited

in his ability to understand and remember detailed instructions. Id. at 101. In the

category of sustained concentration and persistence, Plaintiff was moderately limited in

his ability to carry out detailed instructions, perform activities within a schedule, maintain

regular attendant, and be punctual within customary tolerance, sustain an ordinary routine

without special supervision, work in coordination or proximity to others without being

distracted by them, and to complete a normal workday and workweek without

interruptions from psychologically based symptoms and to perform at a consistent pace

without an unreasonable number and length of rest periods. Id. at 102. In the category of

social interaction, Dr. Jonas opined that Plaintiff was moderately limited in his ability to

interact with the general public, get along with co-workers or peers, and accept

instructions and respond to criticism from supervisors, with no evidence of limitation in

his ability to ask simple questions or request assistance. Id. In the category of adaptation

limitations, Plaintiff was moderately limited in his ability to respond appropriately to

changes in the work setting and to travel in unfamiliar places or use public transportation,

and was not significantly limited in his ability to set realistic goals or make plans

independently of others. Id. at 103. Dr. Jonas explained that Plaintiff was capable of

making simple decisions and carrying out short, simple instructions, that his mental

impairments did not preclude him from meeting the basic mental demands of competitive tasks on a sustained basis, and that he would benefit from a stable setting in which public interaction demands were low.  Id.

Plaintiff's outpatient treatment at NHS was interrupted by a period of incarceration, see tr. at 399, and records for this period from George W. Hill Correctional Facility are contained in the record.  Id. at 348-439.[17]  These records reference Plaintiff's "[s]trong history of bipolar disorder," id. at 404, and they include prescription refills of his psychiatric medication.  See, e.g., id. at 400 (06/27/15), 407 (09/18/15), 411 (10/19/15), 424 (03/22/16), 432-33 (04/25/16), 436 (06/06/16).

On October 6, 2016, Plaintiff returned to NHS for mental health services.  Tr. at 452.  An intake form completed on that date listed Plaintiff's diagnoses as Bipolar disorder, NOS, Panic Disorder without Agoraphobia, and Polysubstance Dependence Disorder, and indicated a short-term treatment goal to decrease his anxiety.  Id. at 452, 453.  During this period, Plaintiff's medications consisted of Seroquel, Tegretol,[18] and doxepin.  Id. at 445 & 462 (11/29/16), 458 (01/31/17).

On November 29, 2016, Usha Kasturirangan, M.D., at NHS completed a Comprehensive Psychiatric Evaluation/Re-evaluation.  Tr. at 443-51.  Dr. Kasturirangan

---

[17]Plaintiff testified that he was incarcerated for "11, 12 months" from June 2015, and that he continued to receive medication, "but not like . . . though NHS."  Tr. at 40.

[18]Tegretol (generic carbamazepine) is used to treat certain types of seizures and nerve pain by decreasing nerve impulses that cause seizures and pain.  See https://www.drugs.com/trileptal.html (last visited July 8, 2019).

noted Plaintiff's history of depression, anxiety, and panic attacks and also his step-father's physical and psychological abuse.  Id. at 443.  Plaintiff reported that he worked at UPS until 2006 when he became paranoid and started calling out from work, eventually ending up in the homeless shelter system, and that he has periods of self-seclusion and is easily distracted.  Id.  On mental status exam, with regard to Plaintiff's mood, the doctor indicated that he was anxious, depressed, helpless, irritable, and showed lack of interest. Id. at 448.  Plaintiff exhibited paranoid thought content, fair judgment and insight, moderate impairment of concentration/attention, and average intelligence.  Id. at 448-49. In addition to the problems identified in Plaintiff's history, Dr. Kasturirangan listed Plaintiff's problems as "mood swings with insomnia," with "sleep sporadic on meds," and "mood better on current med[ications], anxiety is worse."  Id. at 449.  The doctor diagnosed Plaintiff with bipolar affective disorder, mixed, G[eneralized] A[anxiety] D[isorder], and alcohol dependence, in remission for a year.  Id. at 451.[19]

In an NHS Psychiatric Progress Note dated January 21, 2017, Plaintiff reported that his medication helps with mood swings, that he has mild paranoid thinking, does not isolate himself anymore and sleeps well at night while on medication, continues to experience "bad anxiety" and is "fearful to leave the house."  Tr. at 456.  He denied medication side effects other than dry mouth.  Id.

---

[19]"The essential features of [GAD] is excessive anxiety and worry (apprehensive expectation) about a number of events or activities," and where "[t]he intensity, duration, or frequency of the anxiety and worry is out of proportion to the actual likelihood or impact of the anticipated event."  DSM-5 at 222.

C.    **Hearing Testimony and Other Evidence**

At the January 22, 2017 administrative hearing, the ALJ heard testimony from Plaintiff, his NHS case manager Tori McCallum, and a vocational expert ("VE"). Tr. at 33-64. Plaintiff testified that he lives with his mother in Ridley Park, Pennsylvania, and last worked at UPS as a package sorter. Id. at 34-35, 39.[20] He explained that he left that job because he started experiencing mental health problems and associated "harassment," as well as medical problems from standing on his feet for entire shifts, and that he did not know how to utilize his union rights when they replaced him or to handle medical insurance when he sought treatment. Id. at 35-36.

Plaintiff testified that he sometimes helps his mother with light duties around the house, including food shopping. Tr. at 39. He explained, "I don't get out of the house much. It's bothering me now to be out. I'm getting a little upset. . . . And I don't even go out unless somebody will come to me, or I get to go with somebody." Id. Plaintiff testified that he stopped seeing his NHS therapist because "I'm not a happy person [and] she was always happy. . . . I couldn't do it no more." Id. at 42. His case manager and mother assist him generally and with socialization, but "I have a hard time doing that. I used to leave a lot. I'd rather just go home." Id. at 43. If he steps outside he wants to go back home where he feels safe. Id. at 46.

On a typical day, Plaintiff watches a lot of television and helps around the house "a little bit." Tr. at 43, 44. He does not feel comfortable taking public transportation and

---

[20]Plaintiff also has one adult son. Tr. at 443.

tries not to sit around people, and his NHS case manager picks him up or takes him home from appointments. Id. at 45. Plaintiff does not have friends in the neighborhood. Id. His anxiety is less with medication, but he still has "panic attack" feelings at times. Id. at 46.

Plaintiff's NHS case manager, Ms. McCallum, testified that she has known Plaintiff for "around seven or eight months." Tr. at 50.[21] Aside from their initial meeting, Ms. McCallum met with Plaintiff at his home at his request because it would be easier for his anxiety than "having him . . . come all the way out using public transportation." Id. at 51. She also drove him to the hearing "because he would not have been able to come in even on public transportation on his own." Id. at 52. She needs to give Plaintiff at least one week's notice of a meeting because his anxiety "limits him in being able to meet with people, and maintain a schedule." Id. at 51. Ms. McCallum explained that when Plaintiff gets very anxious, he will bite his nails, have difficulty verbalizing and concentrating, and will "often leap from topic to topic very quickly." Id. When the ALJ asked Ms. McCallum whether she had noticed a change in Plaintiff over the past seven or eight months, Ms. McCallum stated, "It's kind of been staying the same." Id. at 53. She then explained that whereas initially they had a few goals with treatment, he became so nervous leading up to the hearing that "we've had to limit [him] to one goal because he cannot focus on another goal beyond this one." Id.[22]

---

[21]Ms. McCallum did not testify regarding the frequency of her meetings with Plaintiff, nor do NHS records shed light on the frequency of their meetings.

A VE also testified at the administrative hearing. Tr. at 57-62. The VE described

Plaintiff's past relevant work as a UPS parcel sorter as unskilled and medium, but light as

Plaintiff performed it. Id. at 58. The ALJ asked the VE to consider a hypothetical

individual who could perform work at any exertional level, limited to simple work-

related decisions, who could occasionally respond appropriately to supervisors and

coworkers, and never respond appropriately to the public. Id. at 60. The VE testified

that such a person could perform work that existed in significant numbers in the national

economy such as industrial cleaner, landscape laborer, and laundry worker. Id. at 61-62.

When the ALJ added that the hypothetical individual would be unlikely to maintain a

regular work schedule and would miss as many as four full days per month from full-time

work schedule, the VE testified that such a person would be unable to sustain

employment. Id. at 62. The VE agreed with Plaintiff's counsel that the ability to go to

work on a regular basis is the requirement of any job. Id. at 63.

### D.    <u>Consideration of Plaintiff's Claims</u>

Plaintiff first argues that the ALJ's decision is not supported by substantial

evidence because the ALJ failed to consider or even acknowledge the hearing testimony

---

[22]Plaintiff's and the case manager's testimony is largely consistent with Plaintiff's Function Report, tr. at 232-39, and a Third-Party Function Report completed by Plaintiff's mother. Id. at 241-48. For example, Plaintiff listed his conditions as anxiety, panic attacks, and isolation, and indicated that he is "afraid to leave the house," id. at 232, and identified "unusual behavior or fears" as "[f]ear of leaving the house, avoid social situations." Id. at 238. Similarly, Plaintiff's mother indicated that due to agoraphobia Plaintiff rarely goes outside, that someone is with him "[a]lmost all the time" when he does go out, and that he has no driver's license. Id. at 244. In response to the question, "Have you noticed any unusual behavior or fears . . . ?" she wrote, "Fear of going out. Fear of doing the wrong things. Fear of someone not liking him." Id. at 247.

of Ms. McCallum, Plaintiff's case manager, thereby undermining the Commissioner's step-five determination that there are jobs Plaintiff can perform. Doc. 17 at 3-8; Doc. 19 at 1-6. Defendant counters that the ALJ was not required to specifically address Ms. McCallum's testimony, that the failure to do was harmless, and that the ALJ's decision is supported by substantial evidence. Doc. 18 at 6-8.

"The ALJ has a duty to hear and evaluate all relevant evidence in order to determine whether an applicant is entitled to disability benefits." Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981); see also Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999) ("The ALJ must consider all the evidence and give some reason for discounting the evidence she rejects."). The "ALJ may not reject pertinent or probative evidence without explanation," Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 204 (3d Cir. 2008), because otherwise "the reviewing court cannot tell if significant probative evidence was credited or simply ignored." Cotter, 642 F.2d at 705. Moreover, controlling regulations define "evidence" to include evidence from nonmedical sources, defined as "any information or statement(s) from a nonmedical source . . . about any issue in your claim." 20 C.F.R. § 416.913(a)(4). Therefore, although "[t]here is no requirement that the ALJ discuss . . . every tidbit of evidence included in the record," Hur v. Barnhart, 94 F. App'x 130, 133 (3d Cir 2004), evidence from non-medical sources should be considered where such evidence goes to an issue in the claim.[23] See Social Security Ruling 06-03p, "Titles II

---

[23]In arguing that the ALJ should have considered Ms. McCallum's testimony, Plaintiff also invokes 20 C.F.R. § 416.927(f), which governs opinions from sources other than acceptable medical sources. Doc. 17 at 4-5. Plaintiff is incorrect. Ms. McCullum's testimony did not reflect her judgment about the issues addressed in medical opinions

and XVI: Considering Opinions and Other Evidence From Sources who are not 'Acceptable Medical Sources' in Disability Claims," 2006 WL 2329939, at *2 ("In addition to evidence from 'acceptable medical sources,' we may use evidence from 'other sources' . . . to show the severity of the individual's impairment(s) and how it affects the individual's ability to function.").[24]

Here, Plaintiff asserts that "[t]he substantive issue in this case was whether [Plaintiff] could get out the door on a regular basis to go to work." Doc. 19 at 6. Ms. McCallum was Plaintiff's case manager from NHS, the facility where Plaintiff has obtained mental health treatment since 2010, and she had worked with him for seven or eight months prior to the hearing. She testified in person regarding her first-hand knowledge of Plaintiff's anxiety and how it affected his ability to leave his home, use public transportation, meet with people, maintain a schedule, and cope with more than one goal at a time. Tr. at 50-53. This testimony was relevant to whether Plaintiff has functional limitations as a result of his anxiety, yet the ALJ apparently ignored it.

---

from acceptable medical sources, for example what Plaintiff can do despite his impairments and what specific functional limitations are caused by his impairments. Therefore, her testimony is not an "opinion" entitled to consideration under that section. See 20 C.F.R. § 416.927(f); see also id. § 416.927(a)(1) (defining "medical opinions" as "statements . . . that reflect judgments about the nature and severity of your impairment(s), including . . . what you can still do despite your impairment(s)").

[24]S.S.R. 06-03p was rescinded effective on March 27, 2017, because it was inconsistent with regulatory amendments which went into effect on that date. See 82 F.R. 15263, 2017 WL 1105349 (Mar. 27, 2017). However, the revised rules governing the evaluation of medical evidence apply to "claims filed on or after March 27, 2017." 82 F.R. 5844, 2017 WL 168819 (Jan. 18, 2017). Because Plaintiff filed his present claim for SSI in December 2013, S.S.R. 06-03p applies.

In the opening of his decision, the ALJ stated that Plaintiff and a VE testified at the hearing, omitting reference to Mrs. McCallum. Tr. at 13. The ALJ then failed to mention Ms. McCallum's testimony at any point in the opinion. The ALJ referenced Plaintiff's testimony, including that he relied on his case worker and mother for help, and also referenced Plaintiff's function report. Id. at 17-18. However, the ALJ's opinion is devoid of any reference to Ms. McCallum's testimony (or, for that matter, the Third-Party Function Report completed by Plaintiff's mother).

Defendant attempts to excuse the ALJ's omission by relying on the ALJ's statement that he reached his conclusion "[a]fter careful consideration of the entire record," Doc. 18 at 6 (citing tr. at 17), and urges the court to "take [the ALJ] at his word." Id. at 7. Under the circumstances of this case, however, it was incumbent upon the ALJ to acknowledge and consider the case manager's testimony.

Unlike many of the abilities identified in an RFC, such as strength or reasoning level, a claimant's ability to leave his or her home due to anxiety is not easily reduced to an objective number or measure. That is not to say it cannot be assessed based on consideration of such things as a claimant's educational and vocational history, notations made in treatment records, Plaintiff's subjective reports, and the testimony of knowledgeable third parties. Here, each of these sources supports the conclusion that Plaintiff has some degree of difficulty leaving his home on a consistent basis.

Plaintiff is a high school graduate who served in the Army and who worked consistently from the time of his honorable discharge in 1986 until the onset of mental health symptoms in 2006, his original alleged disability onset date. Mental health care

providers treated Plaintiff with individual therapy and a regimen of three psychiatric medications over almost the entire relevant period, and although his diagnosis of Panic Disorder with Agoraphobia (see, e.g., tr. at 302) changed to Panic Disorder without Agoraphobia (see, e.g., id. at 452), treatment records and evaluations consistently document anxiety and difficulty leaving his home.  These records include Dr. Kasturirangan's November 29, 2016 evaluation indicating that Plaintiff's "mood [is] better on current med[ications], anxiety is worse" (id. at 449), and an NHS Psychiatric Progress Note dated January 21, 2017, incongruously stating that Plaintiff did not isolate himself anymore but continued to experience "bad anxiety" and remained "fearful to leave the house."  Id. at 456.  In any event, stability attributed to medication and/or therapy does not necessarily mean that a person with mental impairments marked by anxiety can return to work.  See, e.g., Morales v. Apfel, 225 F.3d 310, 319 (3d Cir. 2000) ("For a person . . . who suffers from a . . . disorder marked by anxiety, the work environment is completely different from home or mental health clinic.")  Moreover, the treatment records and evaluations evidencing anxiety and self-seclusion are consistent with Plaintiff's subjective reports and, more significantly, they are consistent with both pieces of third-party evidence -- specifically, the Third-Party Functional Report completed by Plaintiff's mother and the hearing testimony of Ms. McCallum, Plaintiff's case manager.  Under the circumstances, the ALJ's omission of any reference to this evidence constituted error.

Defendant alternatively argues that the ALJ's failure to consider the case manager's testimony is harmless because it is "duplicative" of Plaintiff's own testimony

and would not have changed the outcome of the case. Doc. 18 at 8. However, the case manager's testimony is not merely duplicative, but rather it is corroborative of Plaintiff's testimony as to the sole issue at the heart of the case -- namely, whether he is able to leave his house on a consistent basis. This is particularly important because the ALJ found that Plaintiff's subjective complaints "are not entirely consistent with the medical evidence <u>and other evidence in the record</u>." <u>Tr.</u> at 19 (emphasis added). Had the ALJ included reference to Ms. McCallum's testimony, the ALJ could not have made this statement. <u>See</u>, <u>e.g.</u>, <u>Mantell v. Berryhill</u>, Civil No. 17-0128, 2018 WL 3060087, at *10 (M.D. Pa. May 30, 2018) (Schwab, Chief M.J.), Report and Recommendation approved and adopted, 2018 WL 3060037 (June 20, 2018) (Mariani, D.J.) (ALJ's failure to address testimony of third-party witnesses warrants remand where ALJ made credibility determination regarding claimant and third-party witnesses' testimony corroborated claimant's). Moreover, resolution of this issue is crucial in light of vocational testimony that a person would be unable to sustain employment if they missed as many as four full days per month from full-time work, and that the ability to go to work on a regular basis is the requirement of any job. <u>Tr.</u> at 62-63

In sum, it was incumbent upon the ALJ to acknowledge and consider the case worker's testimony regarding the extent of Plaintiff's anxiety and ability to leave his home, and the ALJ's failure to do so warrants remand. Moreover, because the case worker's testimony corroborates Plaintiff's subjective complaints regarding his inability to leave the house on a regular basis, remand for proper consideration of the case worker's testimony necessarily requires remand for reconsideration of Plaintiff's

subjective complaints in this regard and, if necessary, for the ALJ to obtain additional expert opinion evidence addressing the issue of Plaintiff's ability to leave the home.

IV.   **<u>CONCLUSION</u>**

The ALJ's failure to acknowledge or consider in-person testimony by Plaintiff's case manager requires remand. Plaintiff's subjective complaints should be reconsidered in light of the entire record, including the case manager's testimony and his mother's function report. Reconsideration of this evidence may necessitate additional expert opinion evidence regarding Plaintiff's ability to leave the home. After reconsidering the evidence, the ALJ will reassess Plaintiff's RFC and, if necessary, obtain additional vocational evidence.

An appropriate Order follows.